Good morning, ladies and gentlemen. Our first case for argument this morning is East St. Louis v. Netflix. Ms. Sims. Your Honor, good morning. Good morning, counsel. It's a privilege to be here today. Thank you for agreeing to have our oral arguments. As you'll see, this is a very important case. Not only have we filed this lawsuit, but there have been numerous other lawsuits filed throughout the country. I am here representing the City of East St. Louis in its capacity individually, but also as class representative for other similarly situated municipalities and local governments in Illinois. At the heart of this case lies a simple but profound question. Before we get into the merits, Ms. Sims, we need to discuss subject matter jurisdiction. And I wonder why there is any. So we sued under diversity for the defendants, of course. Well, isn't that the problem? You have defendants, which are extraordinarily complex entities that have many layers of organization. And there's one in particular that I'm worried about, which is AT&T Capital Services, which turns out to be the seventh level owner of Warner Media Direct. AT&T Capital Services appears to have its principal place of business in Illinois, and then there's no diversity jurisdiction. That's the problem, or that's the most serious problem. At the time we filed, I don't believe we were aware of that. It's clear you weren't aware of it, but the question is not whether you were aware of it, but whether it's true. Well, it appears that it is. Well, so you agree that it is. It appears that it is, yes. Then why are we here? If you believe that, indeed, you have sued somebody from Illinois, then there is no diversity jurisdiction, and your ethical obligation is to dismiss this suit, if that's what you believe. That is well taken, yes. Then why are we here? I guess I don't have an answer for that. I appreciate the question. Your brief asserts that there is complete diversity, so are you now telling me that you made a knowingly false assertion? No, I believe at that point in time, Your Honor, when we filed our brief, there was a request upon the defendants, a request upon us, to supplement that information. We inquired of the defendants that information. They provided it to us, and we supplemented it after we filed the brief with this court. If you believe there is no diversity, then what else is there to do? If that change in the ownership happened? There's no change in ownership that we can tell. Diversity jurisdiction depends on the matters on the day the complaint is filed. So far as I can tell, there's been no change afterward, and no change would count. But there may be an increase in knowledge, because it looks like your client filed this lawsuit believing that jurisdiction was supported by the Class Action Fairness Act. And not having done any research, you or your client didn't find Section 1332-D4, which says that the Class Action Fairness Act does not provide jurisdiction in cases like this. And so the fallback is diversity of citizenship. And as I say, if you agree that AT&T Capital Services has its principal place of business in Illinois, we're all done here. And I take it that you are now agreeing that that's true. Needless to say, I will ask Mr. Garay whether he agrees that that's true, because his brief also asserts that there's complete diversity. Would you like me to defer to counsel for the question or proceed? Well, you're here. If you want to try to argue the merits in the case something is miraculous, please go ahead. But if you agree that there's no diversity of citizenship, it's hard to see where we can go. Well, if I may, Your Honor, if I could reserve the rest of my time. No, you can't reserve the rest of your time. The rest of your time is rebuttal time. Right? If you want to make any argument on the merits, now is your only time. Your Honor, I apologize for the issue about subject matter jurisdiction. I would like to proceed on the remaining issues for the court. This case arises from the corporate behavior of streaming companies who have deprived local governments from the routine revenues owed in exchange for use of their public resources. Now, the district court dismissed our five-count cause of action with the utmost respect to that lower court. We believe it was an error. The district court erred when it ruled that the city did not have a right of action to seek the 5% gross when it properly alleged that the streaming companies used private content delivery networks located either connected to or within the local Internet service providers and which are located within the public rights of ways. The district court erred also when it concluded that the city did not allege that the streaming companies have trespassed on the city's rights of ways, dismissing our trespass and unjust enrichment accounts, even though the complaint states that the streaming companies utilize private content delivery networks in the local rights of ways as a way to stream their products. The district court erred when it dismissed the city's claim based on an ordinance on its face prohibits the resale of cable communication. And we ask this court to consider the broader implications of allowing streaming companies to operate unchecked and unaccountable to local communities. We believe that a proper application of the law will affirm the rights of cities like East St. Louis, ensuring that they are not marginalized by the business interest of these streaming company giants. To avoid compensating municipalities for the use of their infrastructure, the streaming companies have leveraged private interconnection agreements with cable providers to house their video content on servers located within the ISPs, and that's in the amended complaint paragraphs 35 to 69. Netflix terms these servers open connect appliances. Appliances would indicate that it is an actual physical piece of equipment. That's in the amended complaint paragraph 43. Netflix alone has placed nearly 1,000 of these servers in the United States, many of which are directly connected to the ISPs. So there is equipment either in the rights of ways or connected there too. Remarkably, these companies elude both state and federal oversight but look to wield those same statutes as a shield against these local government rights. On the express right of action, in the using language, using it as a shield, can you tell me where in the record did we raise the argument regarding Section 901? 901 of the Federal Cable Act? Of the Illinois statute? Of the Illinois statute. The defense argued, as you may recall, that you forfeited any such argument. Yes, yes. Well, the express right of action, okay, for purposes of this argument here today, I think has been somewhat— The question was whether you raised the 901 point in the district court. No. Okay. Why isn't that a forfeiture? Well, the express right of action, we believe, is against the weight of the other cases. It's not our best argument. Our best argument is the implied right of action. So given the—go ahead. I'm sorry. Go ahead. Sorry. So how do we agree that Section 901 argument was forfeited? Yes. And so you didn't contest the Section 1301 expressed, and so are we agreeing that that has been waived? Yes. All right. So we're moving only to the implied right of action? Yes, yes. For purposes of the argument today, I had prepared to just talk about the implied right of action. I want to be clear, though, that you agree that the Section 901 argument has been forfeited? Yes. Okay. So we are just focusing on the implied right of action? Yes, yes, yes. The fact, though, that the statute does create a right of action under 901— Right. —seems to weigh against finding a separate implied right of action, right? The— That is, the legislature— Yes. —said here's something that local governments can do. Well, but it was very ambiguous. That expressed right of action, we believe, was ambiguous as to this action brought before this Court regarding the auditing of the defendants' 5%. We're not seeking that they apply or receive their holder's license, unlike all the other cases that have been filed. We're not seeking that. We're not asking that they stop their services. We're not asking that they reapply for their holder's certificate or apply for— Are you asking that they all place customer service facilities within each local government boundary? We believe, based upon the publicly—public available information and the business model of the streaming companies, that in order to stream their content, they have to place these servers or private content delivery appliances on or— That's not my question. My question is about the point that the defense made under 22-501, I believe it's B-3, that cable or video providers shall maintain a customer service facility within the boundaries of a local unit staffed by a customer service representative, et cetera. You saw the argument? Yes. Are they reading the statute correctly? Yes. That if they are deemed providers, then anybody that you think is a video service provider has to open up a storefront in East St. Louis. Is that right? If they are a holder under the state statute, yes. Would that—so any streaming company— Illinois has, what, 2,000 municipalities? Yes. That they're going to have to—as you read the statute, then every one of them has to open up a separate customer service facility, brick-and-mortar facility in every one of those municipalities they serve? If they are granted a holder's license, they would have to do that. But you're saying they have to have a holder's license to do what they're doing, right? That's what the statute says, yes. Doesn't that strike you as kind of an odd result? Well, no, not when they have equipment in the rights of ways. If they have equipment in the rights of ways, such as these appliance and servers, then they should be responsible and have somebody local to talk about if something were to happen to that equipment, they should have a local person to address those issues with the city. So how many video service providers do you think—who qualifies? We have the big players here as defendants, right? Right. How about a network that produces video content and then arranges to have it streamed? If they use the local rights of ways. Well, ultimately the streaming would happen. So like NBC and ABC and how about, let's say, the producers of Yellowstone, popular series streamed for lots of people all over the country? Are they—that's streamed through all these facilities you're talking about. Are they video service providers as you see it? The Paramount is. Okay. So Paramount has to open up 2,000 storefronts in Illinois if they want to stream Yellowstone? The statute requires it. Okay. Could I also ask you— What's your— Go ahead. What's your best Illinois case for that proposition? That they would have to provide that? Yeah, we can take that proposition or for the proposition that they are holders. That they are holders is that they are using— No. I asked you what is your best Illinois case for that proposition. We don't have— You don't have an Illinois case? No. That's a separate problem. You're asking us to create what is, I think, a very large innovation in Illinois law, and it's a pretty fundamental principle that if you want an innovation in state law, you need to go to state court. It comes back to my question, why are we here? I'm sorry. I didn't mean to interrupt. No, I just— Well, let me—if I can circle back to the jurisdictional question, though, for a second. Maybe I missed something, but I'm looking at the amended jurisdictional statement that says AT&T Capital Services is a Delaware corporation with its principal base of business in Texas. Was that updated? I would defer—I received that directly from the streaming companies, so I would defer to their information. Could I ask you about your trespass theory? Yes. So— The defense has brought up a line of cases in which, at least as I understand it in Illinois, if a tenant is exercising a leasehold in ways that violate the lease, let's say they're holding parties and charging admission for it, the tenant's guests are there with the permission of the tenant. There might be a breach of contract between landlord and tenant, but the guests of the tenant are not trespassers. That—I didn't see a response from you about that theory. They are not tenants. The cable operator is a holder under the statute, akin to a license, okay? So they have no authority— What we're asking, though, why would the guest, using Judge Hamilton's example, why would the guest be trespassing? Yes, the guest has a physical piece of equipment, the server, that they have connected to the rights of ways. And pursuant to the statute, the only party that can access that rights of way is a successor to the holder of that license. Who owns the wireline facilities that exist in the public right-of-way? The wireline facilities are owned by different cable operators throughout the state. And so what would suggest—I'm trying to follow the trespass argument— that there are any type of physical facilities intruding upon the public right-of-way from those streaming companies? The city owns the public right-of-way, which is land on either side of the road. In order to access that, the cable operators, the owners of the internet service provider lines, they have to get permission from the state and the city. They are holders. They are licensed. Correct. Okay? They are not tenants, unlike an easement. They do not have an easement. They have a license. Okay. We have the easement. The city has the easement. So they are not a tenant of that piece of property. They don't have the ability to assign or have a successor in interest for access to their lines that are located within our easements without permission from the Illinois Commerce Commission. Does the landowner get to dictate to the renter what guest he can have? Well, in this statute, the successor in interest has to apply to the Illinois Commerce Commission and has to notify the city if they're going to be a successor to the party that has the ISP, the wireline facilities. So there's no infrastructure that's being used by the streaming companies in the public right-of-way? Well, they are accessing it. They are using their— That's not my question. Is there any intrusion by the streaming companies into the public right-of-way? We don't know the terms of the interconnection agreements. Those remain private. Why do you need the interconnection agreement to know that? Why don't you just observe the public rights-of-way in East St. Louis? We don't know if there are servers connected or within those rights-of-ways. I don't know why that's an intrusion. Let me ask what seems to me the same question in a different way. Suppose what's passing over a line is not information but electricity, right? It's another thing you can do with electrons. You have utility poles either above ground or buried in East St. Louis, and the electric company, probably Exelon, needs a permit from the city to build and maintain those poles. But Exelon then buys energy from third parties. Indeed, energy is wheeled all around the country. It buys energy from third parties and delivers it to homes in East St. Louis. Does the energy provider need the permission of the city of East St. Louis? No. No. So why is it any different? I just gave you an example with wires on the public way that transmit electrons. That's what Netflix is doing. Those wires on the public way are transmitting electrons. Why is the answer to the two questions any different? Because these streaming companies have physical appliances. They're called open appliance networks. With Netflix, they're able to have computers, servers, either within the ISPs according to their own releases or connected to. So they have a server that is connected to those wire lines. I don't think you understand either how Netflix works or how electricity is wheeled across networks. Ms. Sims, can I ask you to address the effect of House Bill 3808 enacted earlier this year? Yes. It's not effective until January 2024, and we don't know the retroactive effect of that. We don't know whether it is substantive or procedural. Substantive or procedural? Well, there are parts of the Act that talk about definition of service, basic service. We don't know whether it applies to a pending case or not under Illinois law. Well, ordinarily we think of statutory amendments as being either clarifying or a mandatory. Can you point us to any indications you have that this changed the meaning of Illinois' law as opposed to merely clarifying it? It changed the meaning of the service. Why? Why do you say that? The actual Act changed the meaning of what cable service is. My question is, help us understand why we should treat that as substantively changing the scope of Illinois law as opposed to merely clarifying the issue before us here. So, you know, I'm out of time, if that's okay. As long as we're asking questions, you can keep giving answers. Thank you. So the actual amendment that deals with what a definition of cable service is changes the landscape because technology is constantly evolving here. So because it's constantly evolving, we don't know. We can't tell into the future what is happening with these cable communications. So what's happening is—I'm sorry. The definition—pardon me. The definition of cable service drastically changes the effect of the statute. It's not a procedural matter. I'll take that as your answer. Thank you. Okay. Thank you, Counsel. Mr. Garay. You know where we need to start. Yes, Your Honor. Thank you, Judge Easterberg, and may it please the Court. So our understanding is that there is subject matter jurisdiction. One, we did acknowledge in our brief that we believe that the amended jurisdictional statement was correct, and that was based on our understanding. We haven't gone back to drill down. Well, that's the problem, though. The amended jurisdictional statement says that AT&T Capital Services, Inc. has its principal place of business in Texas. Right. Right, and Ms. Sims said on her feet that she got that information from you or your clients. The problem is, if you look at AT&T Capital Services' own website, it lists its headquarters as Illinois. There's some question whether it's in Park Ridge or in Chicago. They list both addresses. LinkedIn lists the addresses of both the President and the CFO as Illinois, and so on. That certainly gives rise to a belief that its principal place of business is in Illinois, and that's a problem. Right. So let me first apologize for not having drilled down to this level. Second, I would suggest that because this court's jurisdiction is conceivably affected, that we would confirm that and provide additional information to the court on that. I do think, though, that there is a legal answer as well. Under our understanding of CAFA, you wouldn't actually— No. If you use real words, that would help. Okay. With respect to CAFA? No. If you use real words, CAFA is not a real word. Got it. If you look it up in the dictionary, it is not a word. The Class Action Fairness Act, Your Honor. If you look at the Class Action Fairness Act, I think in 1332 D-10, our understanding— I'm interested in D-4. D-4 says that a district court shall dismiss any case in which more than two-thirds of the class is in the same state as the defendants and so on. This class, by definition, is an all-Illinois class. It is resting exclusively on Illinois law. Now, if you have some answer to the problem under D-4, I'd appreciate it, but— So under D-10, we think that that puts the focus on the defendant itself, Warner Media, and wouldn't require you to drill down to the level of AT&T data to— No, no, no, no, no, no. Minimal diversity is established. D-4 is a completely different problem. Right. I think—I mean, we would love the opportunity to provide a supplemental brief on this, Your Honor. It's clear we are going to need supplemental submissions on jurisdiction. Yes. Appreciate that, Your Honor. With respect to the issues that have been briefed on the question of the private right of action, I think, as my friend conceded, their argument before this court based on Section 901 of the Illinois statute has been forfeited. In the court below, as the district court acknowledged on page 8 of its decision, the city's argument was based on Section 1301 of the Illinois statute. It's no longer making that argument before this court. Instead, it shifted to Section 901 of the statute and the provision that allows cities to audit the holders of an authorization. That argument is forfeited, and it fails on its own terms because, obviously, none of the defendants here are currently holders of an authorization. There's been no audit, and so there's no conceivable basis for the city to maintain an action under Section 901 itself. There also is no basis for this court to take the extreme step of inferring a private right of action under any other provision of the Illinois statute. Courts across the country, although not binding on this court, have reached the same conclusion in almost identical circumstances, and there's no reason for this court to break from that pack and find any implied basis for the city to maintain this action under the Illinois statute. With respect to the common law claims, it's conceded that both the trespass claim and the unjust enrichment claim rise or fall together, and I think the trespass claim fails for the reasons that Your Honors exposed during my friend's topside argument. I think I want to correct one possible misimpression, though. The streaming defendants here do not install or maintain or construct any facilities on the public rights-of-way. In fact, the complaint at paragraph 60 acknowledges that, as did the city in its brief on page 21. As I said, I have my doubts that Ms. Sims accurately understands what a server is and where servers are located. Right. They're not attached to cables. That's exactly right, Your Honor. And the servers on which they have attempted to shift the focus involving Netflix's Open Connect network are all located on private facilities, and, in fact, they acknowledge that themselves in their complaint. For example, paragraphs 43 and 44 acknowledge that these servers, which are simply like a server you might have underneath a desktop computer, you know, relatively small in size, are located on the ISP's private network facilities. I think, you know, ultimately when you take a step back and you look at what's going on here, I think it's important to appreciate that all the streaming defendants are doing is making content available for individuals to access through their own devices and through their own ISPs over the Internet. This has nothing to do with the defendants actually constructing, installing, or maintaining anything on wirelines in the public rights-of-way, which is the prerequisite for imposing this franchise fee on anyone. And that's why the trespass claim fails as well. There is no physical invasion whatsoever with respect to the city's own property by the defendants for the reasons that they had nothing to do directly with the public rights-of-the-way, for the reasons that Judge Easterbrook acknowledged or noted with respect to the electronic transmission of data over the Internet, which doesn't have any physical component. The claim… Well, electrons are physical. They're just not very big. That's right, Your Honor. And I think it doesn't, that no court has ever recognized that that is a physical invasion. It's certainly not an unauthorized physical invasion here because defendants make their content available through the ISPs, and that ISPs have authorized use of that. I'm sorry, Your Honor. I didn't hear any argument this morning regarding the city. They had raised about the right to enforce its own ordinance. And so do you agree that the city would have the right to enforce its ordinance? It's not limited to the Regulatory Affairs Court? No, Your Honor. So if you look at the terms of the ordinance itself, it allows the city, purports to give the city the right to enforce that in administrative court, the Regulatory Affairs Court, or in certain instances in criminal proceedings. The city's own ordinance doesn't give it the right to pursue a civil action like this, and so the claim would fail for that reason alone, as the district court concluded. So we think the ordinance claim fails as well. Why couldn't the city just go to court to get an injunction to require compliance with the ordinance, not to impose sanctions or penalties, but simply to require compliance? I think it would need a private right. It would need a right of action, Your Honor. It's the lawgiver, right? I'm sorry, Your Honor. I missed it. The city in that case is the lawmaker, the lawgiver. I suppose, Your Honor, it could pass a new ordinance and purport to give it that authority. It hasn't under 8219, which is the ordinance in effect now. If you shift it to the declaratory judgment context, for example, seeking a declaration, it's clear that they would need an independent, substantive right of action in that instance. They haven't pointed to any substantive right of action to maintain that ordinance, whether seeking an injunction or any other enforcement action in this court. I would have thought that was kind of assumed. For example, I don't believe there's any provision in the United States Constitution that I know of that expressly authorizes granting an injunction to enforce its terms, right? I don't believe in the Constitution, Your Honor, but I think you need the right of action to go into federal court to seek relief, whether it's injunctive or not. Okay, federal court, we have limited jurisdiction, et cetera. Right. But in state courts, I would have thought if a state simply announces this is the law, the state government could, at a minimum, seek injunctive relief to require compliance with it. So, Your Honor, I apologize. I mistake your question as referring to this action in federal court. In terms of whether they could go to state court and seek to enforce the ordinance, you know, I don't believe that they could, but I think that would be a different question. But can the district court find that? I'm sorry. But if the district court here is, in essence, standing because there may or, well, let's assume there's sufficient diversity. Right. But then the district court is standing in the shoes of the state court. I don't believe it could, Your Honor. I think the same flaws with this private right of action argument would apply here.  And that ordinance provides very specific means by which it could be enforced, none of which are applicable here. And I think that would resolve the question as the district court concluded. When you look at the East St. Louis Code of Ordinances for the city itself, Section 2-252, it says the mayor and its officials can enforce its ordinance under this regulatory affairs or by any other means. So, why would the injunction route that Judge Hamilton suggested be permissible? I think the language in 8219, which is a more specific provision that they've invoked, would apply here, Your Honor. I also don't think that the city has made an argument under that particular provision. It certainly wasn't made below my understanding, Your Honor. So I think that any claim based on that construction would be forfeited. Mr. Gray, I want to come back to the jurisdictional question. I wasn't fast enough on the uptake when you referred to D-10. I take it you were linking back through, I hate stuff like this, through D-4A-1-Romanet-2-CC. And maybe that's exactly right. I hadn't tried to go through that chain before. But I would like both sides to address whether D-4A-1-Romanet-2-CC, in conjunction with 10, means that the Class Action Fairness Act does provide jurisdiction here. Yes, Your Honor, we would happily do that. Thank you, Your Honor. I reserve my time, or not reserve my time, and my time, unless the court has any further questions, and Mr. Michelopoulos. Thank you, counsel. Mr. Michelopoulos. May it please the court, Pantelis Michelopoulos for this. Even if the city could squeeze past the courtroom's door, despite the presentation by Mr. Garr, they would not go far because of their failure to state a claim under the Illinois law, and in light of the controlling precedent in the circuit of the city of Chicago. And so this law is all about facilities-based providers. It mentions facilities-based providers twice in the introductory provision section 101. And those are the phone companies and the cable companies that need to construct facilities in the public rights of way. They are not the defendants who do neither. Now, what does the city do to cure that disconnect? It uses the innocuous-sounding words, or linked to. In other words, for the law to apply, it is enough if some streaming video equipment is linked to the facilities of the telephone company, which in turn use the public rights of way. But as Judge Beatty correctly remarked in rejecting the trespass claim, this will bring in the entire world. It will make the city of East St. Louis into an Internet policeman. Because the New York Times, the Chicago Tribune, CNN, are no different than Netflix or Dish. They provide streamed video, and they derive revenue from it, whether it's subscription revenue or advertising revenue. And so according to the city, if a Netflix customer wanted a movie, who lives in East St. Louis, and asked his phone company to transmit that movie, along the cornucopia, the trillions of bits that make up the public Internet, that transmission by the phone company would suddenly become a use by Netflix. But if I fly Delta to go to St. Louis, and I want to visit a relative in East St. Louis, I take a taxi. Now, the taxi will drive in East St. Louis roads for the last leg of the commute, but this cannot mean that United Airlines or Delta has used East St. Louis' public rights-of-way. And that's why so many courts have rejected this concept of use. In the words of one federal district court in AT&T versus Dallas, it's a metaphysical concept. And the Supreme Courts of Ohio and Tennessee have weighed in, many other courts. But this court has decided, City of Chicago, where it said, it is incontrovertible that in some historical and important sense of the word, it is reasonable to conclude that a non-facilities-based provider, ECI, who was leasing a strand of fiber from the telephone company, then Ameritech,  And in fact, the court went further and said, because this was a case coming up from the FCC, and I hope Judge Easterbrook, FCC does not offend your preference for actual words, it said, we are confident that even if we were making the initial determination, we would reach the same conclusion. And even the dissent of Judge Rovner, on which the city relies, would not apply here. Because Judge Rovner was concerned about too much weight being assigned by the majority to the distinction between owning a strand of fiber and leasing it. But here there's no leasing either. The video is part of the trillions of bits that make up the public internet. No private lines. And by the way, the complaint is based on most defendants, on allegations made about only one defendant. It's only one defendant that has an interconnection agreement, not a lease agreement. It's only one defendant that places video in a server that's located near or in the phone company's offices, as if the office of the telephone company was located in the public rights of way, something that is not assertive. But in any event, all of those allegations are made about one company. Mr. Michaelopoulos, you all urged us to consider affirming on that ground that the complaint insufficiently identified the role of each defendant. And my question is whether that would really be appropriate, since that is ordinarily such a fixable kind of problem. I would find it difficult to reach that conclusion for the first time on appeal and say that a dismissal with prejudice should be affirmed without giving an opportunity to a defendant. I understand, Judge Hamilton, but there clearly is no good faith basis on which to make those allegations about the other defendants. Well, I don't know if I know that. You have other arguments. I'm simply discouraging you from pursuing this alternative ground for affirmance. Yes, I understand. I mean, the record is not replete, but does contain references to those peering agreements by which most video passes alongside the public Internet, and there's no need for any specific interconnection agreement between the streaming provider and the phone company or the cable company. But I understand your point. And let me just say one thing about the ordinance, the colloquy that we had with Mr. Garr. The idea is unauthorized resale of cable service. But this is totally apples and oranges. We're not talking about resale of cable service here. In fact, what the city's position is, is that what our clients are providing is something distinct from cable service, video service. So how can there be an unauthorized resale of cable service? And finally, the city is talking about protecting the city, but it's not really talking about protecting the city's residents because it is they who would bear the brunt of the fee. The Sixth Circuit in Eugene, the FCC, has said, of course, those fees are passed through. And this law contains a specific contemplation of the pass-through. And so far from lining the pockets of the council. Thank you, Counselor. All right, thank you. The case is taken under advisement.